UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ORTHOTEC, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> HOLMED CORPORATION, ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. _____ <br><br> **04 MBD 10347** <br><br> MEMORANDUM IN SUPPORT OF MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DUCES TECUM AND MOTION FOR SANCTIONS IN THE FORM OF AN AWARD OF ATTORNEYS' FEES AND COSTS |

I.  **PRELIMINARY STATEMENT.**

On August 26, 2004, the plaintiff OrthoTec, LLC ("OrthoTec") served the defendant Holmed Corporation ("Holmed") with a deposition subpoena ("Deposition Subpoena") which seeks the production of documents relevant to an action pending in the U.S. District Court for the Central District of California entitled OrthoTec, LLC. v. REO Spineline, LLC et al., Case Number CV03-8346WJR (the "California Federal Action"). (The Deposition Subpoena is attached as Exhibit 1 to the Affidavit of Michael J. Perry ("Perry Affidavit"), filed herewith). In the California Federal Action, OrthoTec named Eurosurgical SA ("Eurosurgical"), REO Spineline, LLC, R&B Medical, Inc. and Brad Harris (collectively, the "REO Defendants" or "REO"), and Mathieu Maassen and Medistraat, Inc., as defendants (collectively, the "Defendants") and asserted claims for patent, trademark, and

1

copyright infringement, unfair competition, intentional and negligent interference with contract, accounting, and breach of a written confidentiality agreement. (A copy of the First Amended Complaint filed in the California Federal Action is attached to the Perry Affidavit as Exhibit 2).

Holmed is not a party to the California Federal Action but rather is a third party witness located in Massachusetts. The Deposition Subpoena which has been served on Holmed seeks the production of documents evidencing the business arrangements between Holmed, Eurosurgical and REO. Holmed has refused to comply with that subpoena without right and without justification.

## II. THE UNDERLYING FACTS REGARDING THE PARTIES AND THE LITIGATION IN LOS ANGELES.

### A. The "Assignment Agreement" - OrthoTec Buys From Defendant Eurosurgical All Rights To Sell Spinal Implants and Instruments.

On September 16, 1998, Eurosurgical signed an agreement with OrthoTec ("Assignment Agreement"; Perry Affidavit, Exhibit 2, tab A), selling to OrthoTec, inter alia: (i) all rights in Eurosurgical's spinal fixation devices and instruments, including the patents, copyrights, and trademarks owned by Eurosurgical, and "_any improvements, alterations, modifications or replacements thereof_", whether created by or for Eurosurgical or OrthoTec (collectively "Spinal Devices"); (ii) the right of first opportunity to market _any new product_ developed or created by or

2

for Eurosurgical at any time; and (iii) the exclusive right to market those devices in the United States.

Thereafter, OrthoTec recorded the patents assigned to it by Eurosurgical and obtained federal registrations of the trademarks "SCS", "SCS Spinal Clip System" and "Zenith" (collectively, the Trademarks"). OrthoTec also developed product information and instructions to be included with the packaging for the Spinal Devices and developed plans and drawings of the Spinal Devices ("Product Literature, Drawings, and Plans"). The Product Literature, Drawings, and Plans were registered for copyrights at the United States Register of Copyrights ("Copyrights").

**B. OrthoTec Obtains FDA Approval.**

To legally import and market the Spinal Devices in the Territory, OrthoTec was required to obtain, and beginning in December, 1998 did obtain, authorizations ("FDA Authorizations") for the Spinal Devices from the United States Food and Drug Administration ("FDA").

**C. OrthoTec Retains Defendant REO As A Distributor.**

**(i) The Confidentiality Agreement.**

On June 23, 1998, OrthoTec entered into a written "Confidentiality and Non-Circumventing Agreement" ("Confidentiality Agreement"; Perry Affidavit, Exhibit 2, tabs I and J) with Brad Harris and R&B Medical, Inc., pursuant to which they agreed: (1) not to disclose any confidential information

that OrthoTec provided to them concerning their opportunity to sell the Spinal Devices; and (2) not to use that information for any purpose other than investigating the opportunity presented by OrthoTec.

### (ii) The "Licensing Agreement."

Thereafter, Harris and R&B Medical, Inc. used the confidential information provided by OrthoTec to form a new company to sell the Spinal Devices, Defendant REO. On March 11, 1999, OrthoTec and Defendant REO entered into a written agreement ("Licensing Agreement"), pursuant to which OrthoTec granted REO the right to distribute the Spinal Devices in the United States in consideration for agreed upon prices and royalties.

### D.  OrthoTec And REO Are Very Successful In The US.

Over the course of the next three years, OrthoTec and REO were highly successful in promoting and selling the Spinal Devices in the United States, ultimately selling tens of millions of dollars worth of the devices to the substantial enrichment of REO, Eurosurgical, and OrthoTec.

### E.  Eurosurgical and REO Plot To Eliminate OrthoTec And Usurp Its Business.

In early 2002, Eurosurgical and REO entered into a secret plan to eliminate OrthoTec from their business dealings and instead establish a distribution arrangement directly between them. Under this arrangement, Eurosurgical and REO agreed to split between themselves the profits formerly realized by

OrthoTec and take from OrthoTec the entire value of its business.

After July 1, 2002, Defendants imported and sold the same Spinal Devices in the United States using the Trademarks and, since November 2003, by associating the Trademarks with the name "ORIA" as to represent the Spinal Devices. After July 1, 2002, Defendants shipped the exact same Product Literature protected by OrthoTec's Copyrights, except that Defendants replaced all references to OrthoTec with references to Defendant REO.

### F.  Defendants Plot To Violate and Circumvent Federal Laws to Import the Spinal Devices Into the US.

In order to get the unauthorized Spinal Devices past United States Customs Officials in the United States, Defendants entered into a further conspiracy with each other to circumvent United States laws and customs controls. Eurosurgical shipped the Spinal Devices from France to Defendants Medistrat and Maassen in Canada, who then repackaged the Spinal Devices into "Medistrat" boxes and shipped them from Canada to REO in the United States.

### G.  OrthoTec Prevails Against Eurosurgical In The Los Angeles Superior Court.

In August 2004, a Judgment was entered against Eurosurgical for, inter alia, breach of the Assignment Agreement. (Perry Affidavit, Exhibit 3)[1]. That Judgment states, in pertinent part:

> "1.  OrthoTec owns all the "Rights" transferred to it by Eurosurgical under the terms of the Assignment Agreement ("Assignment Agreement") dated September 16, 1998, which

---

[1] Orthotec was also awarded $9 million in damages.

<u>remains in full force and effect</u>; [emphasis added]

2.  Eurosurgical's purported reacquisition of the Rights pursuant to Paragraph 12 of the Assignment Agreement was and is invalid;

3.  Eurosurgical, and its officers, agents, employees, representatives, and all persons acting in concert or participating with it shall refrain from claiming or exercising any intellectual property rights or other property rights in the Products and/or any improvements, alterations, modifications or replacements thereof (whether created by or for Eurosurgical or OrthoTec) in the Territory, including without limitation patents, copyrights, FDA 510k's, and trademarks, and Eurosurgical hereby assigns all such rights to OrthoTec;

4.  Eurosurgical, and its officers, agents, employees, representatives, and all persons acting in concert or participating with it, are enjoined and restrained from directly or indirectly selling, distributing, licensing to others, and/or marketing any of the Products and/or any improvements, alterations, modifications or replacements thereof (whether created by or for Eurosurgical or OrthoTec) to anyone in the Territory other than OrthoTec."

**H.  Defendant REO Has Gone Out of Business.**

Following entry of the Judgment, and because thereof, REO recently announced that it has gone out of business (Perry Affidavit, Exhibit 4, Pages 2-3, lines 24-18).

**III. THE UNDERLYING FACTS REGARDING THE DISCOVERY DISPUTE.**

Holmed is engaged in the manufacture and/or sale of spinal instruments, and it has sold those Spinal Instruments to Defendant Eurosurgical. (Perry Affidavit, Exhibit 5).

The Deposition Subpoena commanded Defendant Holmed to produce to OrthoTec documents that are relevant to Holmed's dealings with Defendants Eurosurgical and REO, concerning Spinal

Devices. Neither Eurosurgical nor REO objected to the issuance of the Deposition Subpoena or to Defendant Holmed producing any of the documents requested.

### IV. THE DISCOVERY CONFERENCE.

The parties exchanged written correspondence from August 27, 2004 through September 28, 2004 (Perry Affidavit, Exhibit 6) in an effort to resolve their discovery dispute. The parties also held a telephonic Discovery Conference on September 28, 2004, during which OrthoTec's local counsel, Christine P. Deshler, OrthoTec's California counsel, Michael J. Perry, and Holmed's counsel, James Hamilton, were present. The Discovery Conference was held at 1:00 p.m. and concluded at about 2:00 p.m. The parties were unable to resolve most of their differences.

Holmed insisted that there should be an "attorneys' eyes only" protective order, but failed to articulate any basis for any Protective Order. OrthoTec refused, because a Protective Order is not required under the circumstances. OrthoTec reiterated to Holmed that OrthoTec is only seeking documents that pertain to the Spinal Devices business relationship between Holmed and the Defendants. OrthoTec is not seeking to obtain Holmed's customer lists or manufacturing techniques, other than the manufacturing plans that were exchanged between Holmed and the Defendants.

Defendant Holmed also insisted that the Deposition Subpoena

was overbroad in scope. OrthoTec disputed that contention by pointing out that it is entitled to discover the business dealings between Holmed and Defendants REO and Eurosurgical. The Assignment Agreement granted all rights to the Spinal Devices in existence by Eurosurgical to OrthoTec and any improvements, modifications, alterations, or replacements thereto. In addition, the Assignment Agreement granted to OrthoTec the right to market any and all products subsequently developed by or for Eurosurgical. Thus, OrthoTec is entitled to know about, and utilize, any Spinal Devices and/or Instruments that Holmed designed, manufactured, or created for the Defendants.

Holmed also insinuated that there might be other non-related Spinal Devices business dealings between it and Eurosurgical and/or REO. Later, by written correspondence, OrthoTec invited Defendant Holmed's counsel to identify any such business dealings between Holmed and the Defendants so that there the parties could resolve that alleged overbreath issue. <u>Holmed's counsel refused to respond to this inquiry</u>.[2]

---

[2] The parties did agree on one of OrthoTec's document requests: As to Paragraph 5 of the Deposition Subpoena, Holmed is to provide only invoices stamped "paid", or the like, as evidence of payment or nonpayment.

## V. THE DOCUMENTS REQUESTED IN THE DEPOSITION SUBPOENA AND THE RESPONSES THERETO.

### A. THE DOCUMENTS REQUESTED BY ORTHOTEC:

<u>OrthoTec's Subpoenaed Document Number 1</u>:

Each and every document evidencing each and every correspondence sent, exchanged, and/or received by Holmed Corporation and/or anyone acting on its behalf (hereinafter collectively referred to as "Holmed") to or from Eurosurgical, and each of their employees, agents, directors, officers, shareholders, affiliated and/or associated entities, including, but not limited to, Guy Viart, Mohamed Merzagui, Karen Warden, Pascal Rokegem, Mathieu Maassen, Alain Tornier, Medistrat, David Schlerf, Buckman Company, Emmanuel Margerit, (these persons and Eurosurgical are hereinafter referred to as "EUROSURGICAL") since January 1, 2002.

<u>OrthoTec's Subpoenaed Document Number 2</u>:

Each and every shipping document (including customs forms) relating to the importation by EUROSURGICAL of spinal implants, spinal devices, spinal instruments, and/or spinal product plans that were shipped to Holmed by EUROSURGICAL and each and every document evidencing each and every attempt by REO to purchase spinal implants, spinal surgical devices, and/or spinal instruments from Holmed.

<u>OrthoTec's Subpoenaed Document Number 3</u>:

Each and every shipping documents (including customs forms) evidencing Holmed's shipment of any spinal implants, spinal devices, spinal instruments, and/or spinal product plans to EUROSURGICAL since July 1, 2002.

<u>OrthoTec's Subpoenaed Document Number 4</u>:

Copies of each and every invoice submitted by Holmed to EUROSURGICAL for any spinal implants, spinal devices, spinal instruments, and/or spinal product plans since July 1, 2002.

<u>OrthoTec's Subpoenaed Document Number 6</u>:

Any and all documents including, but not limited to, letters, faxes, and emails received, sent or exchanged by and between Daar & Newman in Los Angeles, Gottlieb & Pearson in Montreal and/or Bernard Colas, Eckert & Seamans, Jeffrey Ray,

9

and/or Andy Fusco and Holmed.

OrthoTec's Subpoenaed Document Number 7:

Each and every Purchase Order Holmed received from REO Spineline, LLC, and any of its agents and/or employees ("REO"), R&B Medical, Inc., Brad Harris, Karen Warden, John Winge, Kurt Kessler, and/or Joe Forte for spinal implants, spinal surgical devices, and/or spinal instruments since July 1, 2002.

OrthoTec's Subpoenaed Document Number 8:

Each and every document evidencing each and every attempt by REO to purchase spinal implants, spinal surgical devices, and/or spinal instruments from Holmed since July 1, 2002.

OrthoTec's Subpoenaed Document Number 9:

Each and every Purchase Order Holmed received from EUROSURGICAL for spinal implants, spinal surgical devices, and/or spinal instruments since July 1, 2002.

OrthoTec's Subpoenaed Document Number 10:

Each and every document evidencing each and every attempt by EUROSURGICAL to purchase spinal implants, spinal surgical devices, and/or spinal instruments from Holmed since July 1, 2002.

OrthoTec's Subpoenaed Document Number 11:

Each and every document evidencing each and every correspondence sent, exchanged, and/or received by Holmed, and/or anyone acting on its behalf to or from REO Spineline, LLC, R&B Medical, Inc., Brad Harris, Karen Warden, John Winge, Kurt Kessler, and/or Joe Forte since January 1, 2002.

B. **HOLMED'S RESPONSES TO EACH REQUEST:**

1. Holmed objects to the Subpoena to the extent it requires the production of documents that are not in the possession, custody or control of Holmed.

2. Holmed objects to the Subpoena to the extent that it seeks documents or testimony protected from disclosure under the attorney-client, settlement, or other privilege, or under the work-product doctrine.

3.  Holmed objects to the Subpoena to the extent that it seeks documents or testimony that are confidential, commercially sensitive and/or proprietary to Holmed.

4.  Holmed objects to the Subpoena to the extent it seeks documents that bear only a tenuous indirect relationship to relevant subject matter and that are not reasonably calculated to lead to the discovery of evidence admissible for issues involved in the pending action.

5.  Holmed objects to the Subpoena on the grounds that it is not reasonably tailored to avoid imposing undue burden and expense on Holmed and therefore, fails to comply with Rule 45(c)(1) of the Federal Rules of Civil Procedures.

6.  Holmed objects to the Subpoena to the extent it seeks documents protected from disclosure under any confidentiality order or stipulation entered into by Holmed or its subsidiaries in any past or present litigation or administrative proceeding.

7.  Holmed objects to the Subpoena to the extent that it purports to require Holmed to disclose testimony, documents or information that Holmed is required to maintain in confidence pursuant to agreement or understanding with any third party.

8.  Holmed objects to any production of any confidential documents before a confidentiality stipulation satisfactory to Holmed has been agreed to and ordered by a court of appropriate jurisdiction.

9.  Holmed objects to this Subpoena to the extent that it requires Holmed to bear any expense in connection with responding to this Subpoena, including but not limited to legal costs and fees, efforts incurred in identifying and retrieving documents and in making them available for production and duplication and shipping costs, and the expenses associated with identifying and producing a witness.

## VI.  HOLMED SHOULD BE ORDERED TO PRODUCE THE DOCUMENTS.

### A.  Each of the Documents Requested Are Relevant to the Claims and Defenses Asserted in the California Federal Action.

Each party generally has the right to discover "any matter, not privileged, that is relevant to the claim or defense of any

party." FRCP Rule 26(b)(1). Relevant information may be discoverable if it "appears reasonably calculated to lead to the discovery of admissible evidence." FRCP Rule 26(b)(1).

The Deposition Subpoena is narrow in scope, being limited to a less than three year time period and restricted to documents pertaining solely to Holmed's business dealings with Defendants Eurosurgical and REO, as they relate to Spinal Devices.

If Defendants' trademark infringement is intentional and/or willful, OrthoTec can recover its lost profits and treble damages. Adray v. Adry-Mart, 76 F.3d 984 (9th Cir 1993); 15 USC Section 1117(b). In a California unfair competition action, the Court can award OrthoTec punitive damages if there is a finding that the Defendants acted with a conscious disregard of OrthoTec's rights. California Civil Code section 3296; Southern Ca. Disinfecting Co. v Lomkin, 183 Cal. App. 3d 431, 7 Cal. Rptr. 43 (1960). If a patent infringement was willful, enhanced damages could be awarded by the Court. 35 USC Section 284.

**Requests Numbers 1 and 11:**

All documents evidencing communications between Holmed and Defendant Eurosurgical and REO are relevant to each one of OrthoTec's intellectual property claims. The manufacturing plans for Spinal Instruments that were requested will show whether: (a) they are for Spinal Instruments that OrthoTec owns all rights to; (b) any of OrthoTec's numerous registered trademarks were

12

identified and designed to be implanted onto the Spinal Instruments: (c) they are similar to OrthoTec's Spinal Instruments; (d) they violate any of OrthoTec's patents; (e) they violate any of OrthoTec's copyrighted manufacturing plans and drawings; and (f) the REO Defendants breached the Non Circumvention and Confidentiality Agreement.

The other written communications between Holmed and Defendants, such as all letters and faxes between them, are relevant to show the: (a) willfulness of Defendants' infringement of OrthoTec's registered patents, copyrights, and trademarks; (b) the value and perhaps the quantity of infringing Spinal Instruments; and (c) whether the REO Defendants breached the Confidentiality Agreement.

**Requests Numbers 2 and 3:**

All shipping documents evidencing Holmed's export and/or delivery of Spinal Instruments to the Defendants will evidence: (a) in part, the quantity of infringing Spinal Instruments available in the stream of commerce and in the possession of the Defendants; (b) the value of the infringing Spinal Instruments; and (c) the use of United States mails, wires and other modes of communication to transport infringing Spinal Instruments.

The manufacturing plans for Spinal Instruments that were requested will show whether: (a) they are for Spinal Instruments that OrthoTec owns all rights to; (b) any of OrthoTec's numerous

registered trademarks were identified and designed to be implanted onto the Spinal Instruments; (c) they are similar to OrthoTec's Spinal Instruments; (d) infringe upon any of OrthoTec's patents; and (e) infringe upon any of OrthoTec's copyrighted manufacturing plans and drawings.

**Requests Numbers 4, 7, and 9:**

All invoices submitted by Holmed to Eurosurgical and/or REO and all Purchase Orders submitted by Eurosurgical and/or REO to Holmed are relevant to determine: (a) in part, the quantity of infringing Spinal Instruments available in the stream of commerce and in the possession of the Defendants; (b) the value of the Spinal Instruments; and (c) the willfulness of the Defendants' intellectual property infringements.

**Requests Numbers 8 and 10:**

All documents evidencing each and every attempt by Eurosurgical and/or REO to purchase Spinal Instruments from Holmed are relevant to determine whether: (a) the REO Defendants breached the Confidentiality Agreement; (b) OrthoTec's copyrighted manufacturing plans and drawings were infringed upon by the Defendants; (c) the infringement of OrthoTec's copyrights was willful; (d) Defendants infringed upon OrthoTec's trademarks; (e) the Defendants' trademark infringements were willful; (f) Defendants engaged in an unlawful and/or unfair business practices as defined by California Business & Professions Code

Sections 17200, et. seq; (g) Defendants infringed OrthoTec's patents; and (h) the patent infringements were willful. Also, the documents are relevant to determine, in part, the quantity of infringing Spinal Instruments available in the stream of commerce and in the possession of the Defendants and the value of those products.

**Request Number 6:**

All documents evidencing any and all communications between Holmed and legal counsel for Eurosurgical and/or REO are relevant to determine whether: (a) the infringement of OrthoTec's copyrights was willful; (b) the Defendants' trademark infringements were willful; (c) the Defendants engaged in an unlawful and/or unfair business practices as defined by California Business & Professions Code Sections 17200, et. seq; (d) the Defendants infringed upon OrthoTec's patents; (e) the patent infringements were willful; and (f) the Defendants are continuing to conspire to violate federal laws.

B.  **Holmed Failed to Show That It Is Entitled to Any Protective Order.**

<u>The Deposition Subpoena does not seek to compel Holmed to produce any documents that Defendants Eurosurgical or REO claim are privileged or confidential</u>. Those Defendants did not assert any objections to the Deposition Subpoena. In any event, there is no authority for the fact that evidence of copyright and trademark violations can be concealed because they are privileged

or confidential.

The Assignment Agreement entitles OrthoTec to all documents regarding the Spinal Devices that have been exchanged by Holmed and Eurosurgical and/or REO. It states, in pertinent part, that: (a) OrthoTec owns all rights to the Spinal Devices and "<u>any improvements, alterations, modifications or replacements thereof</u>, whether created by or for Eurosurgical or OrthoTec"; and (b) the right of first opportunity to market <u>any new product</u> developed or created by or for Eurosurgical at any time. Accordingly, the documents OrthoTec is seeking from Holmed are not privileged and/or confidential as to OrthoTec.

Finally, Holmed has not made any effort to demonstrate that it has a protected interest in or to the documents requested and has not sought, nor obtained, a protective order from either this Court or the California federal court. Nor has Holmed presented any evidence that it was bound by <u>any protective order or confidentiality agreement not to produce the documents subpoenaed</u>.

Throughout the meet and confer process, Holmed has failed to meet its burden, let alone demonstrate, that OrthoTec is seeking any trade secret or other confidential research, development, or commercial information and that its disclosure would be harmful to Holmed's interest in the property. <u>In re "Agent Orange" Prod. Liab. Litig.</u>, 104 F.R.D. 559, 574 (ED NY 1985); <u>Centurion Indus.,</u>

Inc. v. Warren Steurer & Assoc., 665 F.2d 323, 326 (10th Cir. 1981).

To obtain a protective order, the party resisting discovery or seeking limitations thereon must show "good cause" for its issuance. FRCP Rule 26(c). The party seeking a protective order must make a clear showing of a particular and specific need for the order. Pearson v. Miller, 211 F.3d 57, 72 (3rd Cir. 2000); Foltz v. State Farm, 331 F.3d 1122, 1130 (9th Cir. 2003)("broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test").

The following factors are relevant in determining the existence of "good cause" for a protective order: (1) whether the information is being sought for a legitimate purpose; (2) whether disclosure will violate any privacy interest; (3) whether disclosure will cause a party embarrassment; (4) whether disclosure is important to public health or safety; (5) whether sharing of information among litigants will promote fairness and efficiency in the litigation; (6) whether the party seeking the protective order is a public entity/official. Pansy v. Borough of Stroudsburg, 23 F.3d 772, 787-791 (3rd Cir. 1994).

The above-factors demonstrate that there is no need for any protective order in this action. As to items one and five, OrthoTec addressed those elements in the previous section. As to item two, Holmed has never made any showing, throughout the meet

and confer process, that it has any legitimate privacy concerns. The documents requested pertain to Spinal Devices, which OrthoTec owns all rights to, which were <u>exchanged</u> between Holmed and Eurosurgical and/or REO. Neither Eurosurgical nor REO objected to Holmed producing the documents subpoenaed. The Assignment Agreement provides that OrthoTec, is the owner of all rights to the Spinal Devices. Thus, OrthoTec has an absolute right to all documents regarding those products.

As to item three, Holmed has never made any showing during the meet and confer process that production of the documents will result in any embarrassment. Items four and six are not applicable in this instance.

OrthoTec should not be denied the right to review the documents requested from Holmed. Further, an "Attorneys Eyes Only" Protective Order will impair the ability of OrthoTec's counsel to communicate effectively with OrthoTec and would deprive OrthoTec of the ability to obtain expert assistance in interpreting the information contained in the documents.

### VII. ORTHOTEC IS ENTITLED TO ITS ATTORNEYS FEES AND COSTS INCURRED IN CONNECTION WITH THIS MOTION TO COMPEL.

The party who prevails on a motion to compel is entitled to its expenses, including reasonable attorney fees, unless the losing party was substantially justified in making or opposing the motion (or other circumstances make such an award unjust). FRCP Rule 37(a)(4).

An award of expenses does not require a showing of willfulness or improper intent; rather, the standard is whether there was substantial justification for the losing party's conduct. FRCP Rule 37(a)(4). Thus, the burden is on the losing party to affirmatively demonstrate that its position was substantially justified. FRCP Rule 37(a)(4), Adv. Comm. Notes (1970).

There is no justification for Holmed's refusal to produce any of the documents subpoenaed. Accordingly, OrthoTec should be awarded its expenses incurred in connection with its motion.

### VII. CONCLUSION.

Based on the foregoing, OrthoTec respectfully requests that this Court grant this Motion to Compel and award OrthoTec the expenses it incurred in this proceeding.

ORTHOTEC, LLC,

By its attorneys,

_____
Joel A. Kozol (BBO#278620)
Christine P. Deshler (BBO#548206)
FRIEDMAN & ATHERTON LLP
53 State Street
Boston, MA 02109
617-227-5540

Date: December ___, 2004